# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

No. 13-cv-6882 (RJS)
No. 13-cv-7804 (RJS)

---

IN RE FRANCESCA'S HOLDINGS CORPORATION SECURITIES LITIGATION

---

MEMORANDUM AND ORDER
March 31, 2015

---

RICHARD J. SULLIVAN, District Judge:

In these consolidated putative class actions, Plaintiffs bring various claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against Francesca's Holdings Corporation ("Francesca's" or the "Company"), CCMP Capital, LLC and related entities, a number of individuals, and the banks that acted as underwriters for the Company's secondary public stock offerings (collectively, "Defendants"). Plaintiffs allege that, throughout the period from June 2011 through September 2013 (the "Class Period"), Francesca's misrepresented its relationships with certain suppliers by informing the market that its vendors operated independently even though three related vendors provided the Company better-than-market terms. According to Plaintiffs, when the Company's relationships with the three vendors deteriorated, its share price fell. Now before the Court are Defendants' motions to dismiss the Consolidated Class Action Complaint (Doc. No. 30 ("CAC"))[1] in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motions are granted in full.

## I. BACKGROUND

### A. Facts

#### 1. The IPO and Secondary Offerings

Francesca's, a retailer of women's apparel, jewelry, and accessories, was founded in 1999 by John De Meritt ("De Meritt"), Chong Yi ("Yi"), Kyong Gill ("Gill"), and Insuk Koo ("Koo") (collectively, the "Founders"). (Id. ¶ 41.)[2]

---

[1] For clarity, the Court will refer to court filings by the docket entry numbers in *Ortuzar v. Francesca's Holdings Corporation, et al.*, No. 13-cv-6882 (RJS) unless otherwise noted.

[2] The facts are taken from the CAC (Doc. No. 30), documents incorporated by reference therein, and the Company's public disclosures. *See Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y.

The four Founders owned all of the Company's stock until February 2010, when CCMP acquired a controlling interest in exchange for $209 million. (*Id.* ¶ 42.) Following the acquisition, CCMP owned 84% of the Company's equity, De Meritt retained 1,489,708 shares (3.7%), and Gill, Yi, and Koo each retained 1,398,400 shares (3.5%).[3] (*Id.* ¶ 45.) One of the conditions of CCMP's investment in Francesca's was that De Meritt and Gill agree to remain employed at Francesca's for three years (later reduced to two years for Gill) following CCMP's acquisition. (*Id.* ¶ 44.) Additionally, as part of the buyout, CCMP, the Founders, and certain members of the Company's management entered into an agreement (the "Stockholders' Agreement") through which CCMP obtained the right to demand, up to five separate times, that Francesca's register tranches of CCMP-owned Francesca's shares with the SEC for public sale and listing on NASDAQ. (*Id.* ¶ 46.) The Stockholders' Agreement thus gave CCMP the ability to divest itself of its Francesca's shares through public offerings.

On July 22, 2011, consistent with the Stockholders' Agreement, Francesca's conducted an initial public offering (the "IPO"), in which CCMP sold 7,339,800

shares and the Founders collectively sold approximately 1,000,000 shares, at an initial offering price of $17 per share. (*Id.* ¶ 47.) Subsequently, also consistent with the Stockholders' Agreement, Francesca's conducted three secondary public offerings, in January 2012 (the "January 2012 Offering"), April 2012 (the "April 2012 Offering"), and March 2013 (the "March 2013 Offering," and collectively with the January 2012 Offering and the April 2012 Offering, the "Secondary Offerings"). (*Id.* ¶¶ 161, 179, 216.) Ultimately, across the Secondary Offerings, CCMP divested itself of all its Francesca's equity. (*Id.* ¶ 109.)

### 2. The Company's Merchandising Strategy as a Focus of Disclosures

After Francesca's became subject to the reporting obligations of publicly traded companies, its merchandising strategy was a regular focus of its public disclosures. Throughout the Class Period – beginning with offering materials for the IPO and continuing with SEC filings and other statements to the investing public – Francesca's consistently touted as a competitive advantage its "broad and shallow" merchandising strategy, through which it was able to identify trends and source products more quickly than its competitors. (*Id.* ¶ 8.) In the IPO prospectus, for example, Francesca's indicated that one of the "key drivers" of its success was its "ability to quickly identify and respond to . . . trends." (Declaration of Todd G. Cosenza, dated May 13, 2014, Doc. No. 35 ("Cosenza Decl."), Ex. 2 ("IPO Prospectus") at 2.) In support of this strength, it noted:

> Our ability to make decisions quickly on trend-right items combined with the short lead times of our vendors[] maximizes our speed to market, as it generally takes

---

2011), *aff'd sub nom.*, *Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Facts alleged in the CAC are taken as true for purposes of the instant motions. In deciding the motions, the Court has also considered memoranda of law filed by the Company Defendants (Doc. No. 37 ("Def. Mem.")) and the Underwriter Defendants (Doc. No. 34 ("UW Mem.")), Plaintiffs' opposition (Doc. No. 43 ("Opp.")), and the replies by the Company Defendants (Doc. No. 46 ("Def. Rep.")) and Underwriter Defendants (Doc. No. 44 ("UW Rep.")), along with the affidavits and documents submitted in support thereof.

[3] Both Yi and Koo owned half of their shares directly and controlled the other half through a Granter Retained Annuity Trust.

only four to twelve weeks from the time an order is placed to the time merchandise is available on the boutique floor. With these short lead times, we are able to make more informed buying decisions to meet customers' merchandise expectations, and to react quickly to changing fashion trends. This approach . . . is designed to encourage more frequent visits by our customers and reduce the seasonal fluctuations and margin erosion experienced by many other specialty retailers.

(CAC ¶¶ 50, 138; IPO Prospectus.)

Similarly, Francesca's trumpeted its merchandising strategies and successes in quarterly and annual SEC filings. For example, on March 21, 2012, Francesca's filed its Form 10-K annual report for its fiscal year ending January 28, 2012 (the "2011 10-K"). (CAC ¶ 170.) The 2011 10-K repeated in identical form the language from the Company's IPO offering materials with respect to its sourcing strategies, identified above. (Id. ¶ 173.) Francesca's again reiterated this disclosure in substantially identical form in its Form 10-K filing for the fiscal year ending February 2, 2013 (id. ¶¶ 205, 208), which added, "Due to the limited quantity of our buys in any one style, we avoid material inventory positions in individual style[s,] which enhances our ability to quickly deliver trend-right merchandise and minimizes the risk of fashion misses, which can lead to increased inventory markdowns and diminished gross margins." (Id. ¶ 209; Cosenza Decl., Ex. 6 ("2012 10-K"); see also CAC ¶ 159 (December 31, 2011 Form 8-K, quoting De Meritt as stating, "We are very pleased with our strong sales and margin results for the holiday season, which we believe is a

reflection of our *effective merchandising strategy*." (emphasis added)).)

A similar message was expressed in other communications with investors. For example, after Francesca's announced its financial results for the second quarter of 2011, Francesca's held an earnings call and participated in an investor conference. (CAC ¶¶ 150–51.) On the call, De Meritt highlighted the company's success with vendors during the second quarter of 2011, noting that Francesca's had been "pretty consistent in our ability to work with . . . vendors or to leverage the various vendors off of each other and make sure that we're sourcing at the very best costs [which is] something we've been able to consistently achieve." (Id. ¶ 150.) Similarly, during the investor conference, De Meritt remarked that the Company's sourcing allowed it "to be as quick as we can in responding to trends," and "to figure out what [current trends are] and then source those products and get them in stores in a very short time frame." (Id. ¶ 151.) De Meritt and other insiders repeated similar sentiments regarding the Company's merchandising strategy on the Company's first quarter 2012 earnings call, during which De Meritt noted,

As fast followers, we identify main stream trends versus emerging trends . . . . We then source these trends from hundreds of domestic vendors, and deliver it to our boutiques in a relatively short time frame. We also typically buy merchandise for delivery, no more than 90 days out. This gives us the unique ability to source merchandise on a practical, real time basis.

(Id. ¶ 191.) De Meritt made a nearly identical statement on the Company's earnings call announcing its third quarter 2011 financial results. (Id. ¶ 157.)

3

Finally, Francesca's also emphasized its sourcing strategies in offering materials for the three Secondary Offerings. For example, in offering materials for the January 2012 Offering, Francesca's reiterated the IPO prospectus's claims pertaining to the company's sourcing strategies noted above. (*Id.* ¶ 164.) These offering materials also touted the Company's "integrated sourcing, distribution and merchandising process that is scalable and will facilitate the continued growth in the number of boutiques we operate. This process starts with our buyers who work closely with an established and diverse group of vendors to identify trend-right, high-quality merchandise." (*Id.* ¶ 165; Cosenza Decl., Ex. 3 ("Jan. 2012 Offering Prospectus").) Francesca's repeated these same statements in identical form in the offering materials for the April 2012 Offering and the March 2013 Offering. (CAC ¶¶ 182–183, 208.)

In sum, Francesca's and its officers consistently referenced the Company's short lead times and sourcing strategies in public disclosures, offering materials, and other communications with investors.

Analysts took note of this strategy. One analyst, for example, wrote that Francesca's was "almost in a class by itself" when it came to sourcing (*id.* ¶ 70); another noted, "[C]ompetition among multiple vendors keeps prices low and allows the company to build a diverse assortment" (*id.* ¶ 83); and a third stated, "In conjunction with their broad and shallow buying mentality, [Francesca's] benefits from beneficially short lead times . . . . The shorter lead times also help the company to react more quickly to changing fashion trends." (*Id.* ¶ 70.)

Nevertheless, each of the above-referenced SEC filings also warned investors of possible risks associated with

the Company's merchandising strategy. For example, the prospectuses for the IPO, the January 2012 Offering, and the April 2012 Offering all informed investors, in identical form and bold typeface, that the Company's "ability to obtain merchandise on a timely basis at competitive prices could suffer as a result of any deterioration or change in . . . vendor relationships." (IPO Prospectus at 21; Jan. 2012 Offering Prospectus at 21–22; Cosenza Decl., Ex. 4 ("April 2012 Offering Prospectus") at 20–21.) Similarly, each prospectus noted that, lacking any long-term contracts, the Company "generally operate[s] without any contractual assurances of continued supply, pricing or access to new product," and that "[t]he benefits we currently experience from our vendor relationships could be adversely affected if our vendors: choose to . . . discontinue selling merchandise to us; raise the prices they charge us; . . . [or] lengthen their lead times." (*Id.*)

### 3. The Related Vendors

In carrying out its much-ballyhooed merchandising strategy, Francesca's sourced merchandise from over 400 vendors. (CAC ¶ 77.) Among these vendors were KJK Trading ("KJK"), Stony Leather ("Stony"), and KKGM, Inc. ("KKGM") (collectively, the "Related Vendors"), which were each owned by certain of the Founders or family members of the Founders. (*Id.* ¶¶ 33–40.) Specifically, Stony was owned by Defendant Gill's brother and sister, Yi and Koo – each Founders as well – and KJK and KKGM were owned by Koo's brother-in-law, Ki Juing Gu. (*Id.* ¶¶ 39, 85.) Throughout the Class Period, beginning with the IPO, Francesca's disclosed the relatedness of Stony and KJK but insisted that its relationships with the two vendors were proper, and that it negotiated with each at arm's length and on market-based terms. For example, in the IPO offering materials,

Francesca's disclosed the fact that Stony and KJK were its two largest vendors and were owned by certain Founders and close family members of Founders, but stated that, in spite of these relationships, it treated each "as an independent third-party vendor." (*Id.* ¶¶ 54, 141.)    The same disclosure was made in offering materials for the January 2012 Offering and the April 2012 Offering (*id.* ¶¶ 167, 185), the 2011 10-K (*id.* ¶ 176), and the May 25, 2012 Form 14A annual proxy statement to shareholders (*id.* ¶ 178). Indeed, De Meritt reiterated this position during the First Quarter 2012 Earnings Call, stating that he was "incredulous that we keep getting this question concerning the related parties. [A]s we have disclosed from the very beginning . . . we treat those vendors as independent third parties. We negotiate each transaction with them on market terms, treat them at arm's length, and make sure that we are conducting that in the most upright fashion." (*Id.* ¶ 192 (emphasis added).)

Notably, contemporaneous with the IPO, Francesca's also published on its website and in SEC filings a "Related Party Transaction Policy," which required the Company's Audit Committee to review any "material" transaction with a related entity and determine, *inter alia*, either that "the transaction's terms were determined through a competitive bidding process or [that] the transaction [was] on terms no less favorable than those generally available to unaffiliated third-parties under the same or similar circumstances." (*Id.* ¶ 58.) The policy thus also informed the market that Francesca's considered its relationships with all vendors to be arm's-length, as it obligated Francesca's to ensure that to be the case. (*Id.* ¶ 143.)

Meanwhile, consistent with its public references to the strength of its sourcing strategy, Francesca's was indeed able to source inventory quickly.    While its competitors took six to nine months to select and stock new merchandise, Francesca's could obtain new products in four to twelve *weeks*. (*Id.* ¶ 8.)  This allowed it to beat competitors to the market and catch trends while they were still hot, and limited the risk that Francesca's would end up with surplus inventory it would have to mark down in order to sell. (*Id.* ¶¶ 173–74.)

In part as a result of this advantage over its competitors, Francesca's flourished financially throughout much of the Class Period.  Between the July 2011 IPO and March 2013, Francesca's reported consistently positive results across financial metrics, growing from 249 brick and mortar stores to over 450, increasing quarterly income by 150%, growing in same store sales, and exceeding analyst expectations for earnings per share ("EPS") every quarter. (*Id.* ¶¶ 61–64.)  Its monthly gross margins during this period averaged approximately 53% and rose as high as 55%. (*Id.* ¶ 65.)  In turn, during the Class Period, the price of Francesca's common stock soared above the $17 IPO offering price, at one point reaching as high as $35 per share. (*Id.* ¶ 2.)

During the Class Period, Francesca's received approximately 20–25% of its inventory from Stony and KJK. (*Id.* ¶ 93.) Throughout, it was KJK's only customer. (*Id.* ¶¶ 35, 40.) Additionally, KJK operated out of space it subleased from Francesca's, for which Francesca's received no rent payments in 2010 (*i.e.* before the IPO) and received rent of $1000 per month beginning in January 2011 – an arrangement disclosed in the IPO offering materials. (*Id.* ¶¶ 6, 86.) Moreover, neither KJK nor Stony entered into any supply contracts with Francesca's (*id.* ¶ 87), and each sold inventory to the Company on consignment, meaning that Francesca's could return any unsold merchandise to the supplier.    These

arrangements were also disclosed to the public. (*Id.* ¶¶ 87–88.) Deals on consignment, which obviate the need to mark down prices and reduce margins to sell off excess inventory, are rare for retailers in the United States. (*Id.* ¶ 88.)

Moreover, during this period, according to a confidential witness who worked as the Company's Head of Inventory Planning from 2008 through 2011 ("CW-1"),[4] Francesca's received "incredibly cheap" prices from the Related Vendors, such that it "was not driven by the normal supply and demand process" and had margins that were "not possible in retail." (*Id.* ¶ 95.) CW-1 called into question the nature of the Company's vendor relationships in recounting that "we were supposed to be negotiating price and quantities, and that just wasn't the case." (*Id.* ¶ 99.) CW-1 went so far as to call it "almost insulting" that Francesca's "tried to pass [KJK, KKGM, and Stony] off often as[] unrelated compan[ies]." (*Id.* ¶ 98.) As a point of comparison, CW-1 stated that when he or she went to work at one of the Company's competitors – a store called "Charming Charlie" – after leaving Francesca's in 2011, CW-1 noted that the prices Charming Charlie received from Stony were "not as good as the prices [Stony] gave Francesca's"; specifically, the prices Francesca's received from Stony allowed it to post a 70–80% margin, while the same product would be offered to Charming Charlie at a price that allowed Charming Charlie to post only a 60% margin. (*Id.* ¶ 97.) CW-1 also noted, without elaboration, that Defendant Gill directed employees to "manipulate" the purchase-order system to improve lead times. (*Id.* ¶ 99.)

Another confidential witness, who was the Head of Apparel Production at KJK from July 2012 through August 2013 ("CW-3"), confirmed that Francesca's treated KJK "different[ly]" than other buyers treated their vendors. (*Id.* ¶ 101.) According to CW-3, KJK "worked really closely" with Francesca's, doing "a lot of favors" and "ben[ding] over backwards for them." (*Id.*) Additionally, a Production Assistant with Stony from January 2012 through 2014 ("CW-4") noted that Stony provided Francesca's with preferential treatment, and in fact had a "team" of employees specifically devoted to servicing Francesca's, as well as an employee dedicated exclusively to Francesca's – each, within Stony, unique to its Francesca's account. (*Id.* ¶ 102.) Finally, another confidential witness – a Warehouse Manager at Francesca's from 2008 through June 2012 ("CW-2") – noted that he or she learned from Juan Mendez, the Company's Director of Warehouse and Distribution, that Francesca's "made an unusually high profit from Stony merchandise," which it received at "cheap prices." (*Id.* ¶ 104.) CW-2 also reported that Stony was nearly at the "immediate disposal" of Francesca's. (*Id.* ¶ 105.)

Furthermore, CW-1 confirmed that KKGM was "definitely a vendor" during CW-1's period of employment at Francesca's, and recalled that Francesca's was KKGM's only customer and did not maintain any supply contracts with it. (*Id.* ¶ 40.) Francesca's did not disclose its relationship with KKGM or mention KKGM at all in its public disclosures during the Class Period. (*Id.* ¶ 39.)

---

[4] For consistency, the Court refers to the confidential witnesses by the same abbreviations and numbers as used in the CAC.

6

### 4. The Vendor Relationships "Hit a Wall"

Defendant Gill retired from Francesca's on July 10, 2012. (*Id.* ¶ 211.) In the 2012 10-K, Francesca's noted that Francesca's *had* been related to Stony and KJK during the first half of 2012 but ceased being related once Gill retired. (*Id.*; 2012 10-K.) On December 31, 2012, De Meritt retired as CEO and Neill P. Davis ("Davis") took over. (CAC ¶ 108.) Thus, all of the Founders had left the Company by January 2013. (*Id.*) Additionally, between the IPO and the Secondary Offerings, CCMP entirely cashed out of Francesca's. (*Id.* ¶¶ 109–10.)

Subsequently, in early 2013, according to CW-3, KJK's relationship with Francesca's "hit a brick wall" and faced a "sudden halt." (*Id.* ¶¶ 113, 294.) Similarly, CW-4 noted that Stony's relationship with Francesca's cooled off around this time, and Stony dismantled its Francesca's-specific team. (*Id.* ¶¶ 113–14.) Francesca's did not disclose these developments to the market. (*Id.* ¶ 115.) In fact, when Francesca's disclosed its fourth quarter and full year 2012 results on March 19, 2013 – just days before the March 2013 Offering – the earnings it reported exceeded analyst expectations, and Francesca's gave positive guidance to investors without a hint as to the shifts in its relationships with its biggest vendors. (*Id.* ¶ 115.) This caused the stock price to increase 7% to close at $28.91 on March 20, 2013. (*Id.*) When CCMP sold off its remaining shares in the March 2013 Offering a few days later, the offering materials once again failed to disclose the relationship changes. (*Id.* ¶ 116.)

Around this same time, the Company's business began to slow. (*Id.* ¶ 117.) In spring 2013, according to a Store Manager who worked at Francesca's from August 2009 to August 2013 ("CW-5"), Francesca's started issuing "dramatically higher sales goals" to CW-5's store. (*Id.*) Unlike during the preceding three and one-half years of CW-5's tenure with Francesca's, from February 2013 to August 2013, CW-5's store failed to meet its sales goals. (*Id.*) Subsequently, on June 5, 2013, Francesca's announced its results for the first quarter of 2013 (the "June 5 Announcement"). (*Id.*) In that announcement, the Company disclosed that its earnings per share "merely met" consensus analyst expectations, rather than exceeding them as Francesca's had consistently done in the past, and that its growth was starting to slow. (*Id.* ¶ 118.) Additionally, the June 5 Announcement "reported revenue of $79 million [for the first quarter of 2013 versus] consensus estimates of $79.5 million to $80.5 million." (*Id.* ¶ 232.) However, Francesca's also offered positive guidance in the June 5 Announcement, stating that "our differentiated business model and unique brand experience position us well for long-term growth," and projecting a 1–2% increase in comparable boutique sales and $0.35–$0.36 EPS for the third quarter of 2013 – despite the Company's knowledge that at least some of its stores were missing their sales goals. (*Id.* ¶¶ 118–19.) In response to the June 5 Announcement, the Company's stock price dropped 9%, from a close of $30.09 on June 5 to a close of $27.37 on June 6. (*Id.*)

On September 4, 2013 Francesca's announced its second quarter 2013 financial results (the "September 4 Announcement"). (*Id.* ¶ 121.) In the September 4 Announcement, Francesca's disclosed that its "comparable boutique growth" had declined for the first time in the Company's history – by 1% – and that Francesca's expected it to further decline, by 2–3%, in the third quarter of 2013. (*Id.*) Additionally, Francesca's reported $0.33 EPS in the September 4 Announcement,

short of the $0.35 EPS projected by the June 5 Announcement; disclosed that its margins had fallen to 50.7%; and indicated that overall growth would flatten for fiscal year 2013. (*Id.*)

In the Company's September 4, 2013 conference call with investors to discuss its second quarter results (the "September 4 Call"), CEO Davis outlined some of the reasons for the poorer than expected performance. (*Id.* ¶ 122.) Relevant to the instant action, Davis stated,

> Our Fashion Tops business, which is also a big component of our Apparel business, was soft, given our underrepresentation of summertime wear-now silhouettes and fabrications. During the quarter, we had identified that our Tops business needed to be more wear-now and summery. However, the lead times to reorder prevented us from fully capturing the trend. In addition, there's not been a dominant fashion trend to drive and chase in the Apparel category this season.

(*Id.* ¶ 122; Declaration of Todd G. Cosenza, dated Aug. 13, 2014, Doc. No. 45, Ex. 10 ("September 4 Call Tr."), at 3.) Additionally, Mark Vendetti ("Vendetti"), the Company's CFO, informed investors that ending inventory in the second quarter of 2013 was up 32% from the previous quarter, and that "[g]iven our 4- to 12-week lead time . . . we did not adjust immediate inbound merchandise levels to the reduced demand within the second quarter." (CAC ¶ 122; September 4 Call Tr. at 4.) In response to the disappointing September 4 Announcement, the Company's stock price fell 26%, from $24.02 at the close of September 3 to $17.79 at the close of September 4. (CAC ¶ 123.) These actions followed.

## B. Procedural History

On September 27, 2013, Plaintiff John Ortuzar filed a complaint in *Ortuzar v. Francesca's Holdings Corp., et al.*, No. 13-cv-6882 (RJS) (S.D.N.Y.), alleging violations of the Exchange Act and the Securities Act on behalf of himself and all others similarly situated. (Doc. No. 1.) On November 4, 2013, Plaintiffs West Palm Beach Police Pension Fund and Taunton Contributory Retirement System filed the putative class action *West Palm Beach Police Pension Fund, et al. v. Francesca's Holding Corp., et al.*, No. 13-cv-7804 (RJS) (S.D.N.Y.). On December 17, 2013, the Court issued an Order consolidating these two cases, appointing the Arkansas Teacher Retirement System as lead Plaintiff, and appointing the law firms Bernstein Litowitz and Labaton Sucharow as co-lead counsel. (Doc. No. 18.)

Plaintiffs filed the CAC on March 14, 2014. (Doc. No. 30.) The CAC alleges assorted grounds of liability against various Defendants and groups of Defendants. Specifically, it asserts claims for (1) violations of Exchange Act Section 10(b) and Rule 10b–5 against Francesca's and the Individual Defendants (defined herein as Greg Brenneman ("Brenneman"), De Meritt, Theresa Backes, Davis, and Vendetti); (2) violations of Section 20(a) of the Exchange Act against CCMP,[5] De Meritt, Brenneman, Gill, and Davis; (3) violations of Section 11 of the Securities Act against Francesca's, the Officer Defendants (defined herein as De Meritt, Davis, and Vendetti), the Director Defendants (defined herein as Brenneman, Patricia A. Bender, Rich Emmett, Joseph Scharfenberger, Richard Kunes, Marie

---

[5] "CCMP" refers, collectively, to CCMP Capital, LLC, CCMP Capital Investors II, L.P., CCMP Capital Investors (Cayman) II, L.P., and CCMP Capital Advisors, LLC.

Toulantis, and Rich Zannino), and the Underwriter Defendants (defined herein as Goldman, Sachs & Co., J.P. Morgan Securities LLC, Stifel, Nicolaus & Company, Inc., KeyBanc Capital Markets Inc., RBC Capital Markets, LLC, and Jefferies & Company, Inc.); (4) violations of Section 12(a)(2) of the Securities Act against Francesca's and the Underwriter Defendants; and (5) violations of Section 15 of the Securities Act against CCMP, De Meritt, Davis, Vendetti, and the Director Defendants.

The CAC alleges, at base, that while Francesca's thrived financially throughout the Class Period, it was able to do so only through relationships with its "captive" vendors, from which it obtained "enormous non-market preferences and benefits" that would not have otherwise been available. (CAC ¶ 93.) These non-market rates and services allowed Francesca's to operate with less expense and quicker inventory turnover than its competitors, which in turn artificially inflated its profits during the Class Period. (*Id.* ¶ 7.) According to the CAC, however, these circumstances were concealed from the market through misrepresentations that KJK and Stony were treated as independent vendors, and through a failure to disclose KKGM as a vendor at all. Thus, according to the CAC, the Company's successes were artificially inflated in a manner unknown to – and actively concealed from – the investing public, and unsustainable because the Founders' employment agreements had limited terms. (*Id.* ¶ 10.) Once these unsustainable relationships ended, the CAC alleges, the Company's financial performance abruptly crashed back down to earth, lowering the Company's share price and injuring Plaintiffs.

On May 13, 2014, the Underwriter Defendants (Doc. Nos. 33–35) and the Company Defendants (Doc. Nos. 36–38) filed motions to dismiss the CAC in its entirety. The motions were fully briefed as of August 13, 2014. (Doc. Nos. 44–46.)

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

## III. DISCUSSION

As noted above, Plaintiffs assert claims for violations of (1) Exchange Act Section 10(b) and Rule 10b–5; (2) Exchange Act

Section 20(a); (3) Securities Act Section 11; (4) Securities Act Section 12(a)(2); and (5) Securities Act Section 15. The Court will address each of these claims in turn.

## A. Exchange Act Claims

### 1. Section 10(b) and Rule 10b–5

"Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)); *see also* 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Securities and Exchange Commission to implement Section 10(b), more specifically delineates" what constitutes a manipulative or deceptive practice. *Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397, 401 (S.D.N.Y. 2013); *see also* 17 C.F.R. § 240.10b–5.

The elements of a claim under Section 10(b) and Rule 10b–5 are identical. *See In re China Organic Sec. Litig.*, No. 11-cv-8623 (JMF), 2013 WL 5434637, at *6 (S.D.N.Y. Sept. 30, 2013). To prevail under each, Plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Securities fraud claims are subject to the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). "First, a complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances

constituting fraud . . . shall be stated with particularity.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting Fed. R. Civ. P. 9(b)). Second, under the PSLRA, a complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." (*Id*. (citing 15 U.S.C. § 78u–4(b)(2).)

Here, because the CAC does not adequately allege any misrepresentation or omission of a material fact or loss causation due to any alleged misrepresentation, the Court dismisses the Section 10(b) and Rule 10b–5 claims on those grounds.

### a. Material Misrepresentation or Omission

In order to satisfy the first element of a securities fraud claim, a plaintiff must allege that the defendant made a "material misrepresentation or a material omission as to which he had a duty to speak." *S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 162 (S.D.N.Y. 2011).

"To fulfill the materiality requirement, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by [a] reasonable investor as having significantly altered the total mix of information made available.'" *Dalberth*, 766 F.3d at 183 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 329 (2d Cir. 2002) (internal quotation marks omitted). A complaint should be dismissed pursuant to Rule 12(b)(6) based on a lack of materiality only if the alleged misstatements or omissions would be "so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Here, the CAC alleges that numerous statements and omissions in the Company's public filings were materially false or misleading. The gist of the CAC is that consistent references in the disclosures to Stony and KJK as "independent third parties," with which Francesca's negotiated "in the most upright fashion," on "market terms" and in "arm's-length" transactions, were misrepresentations, and that the Company misled the market by covering up and failing to disclose the true nature of its relationships with the Related Vendors.

Specifically, the CAC first alleges that, although Francesca's publicly disclosed that it dealt with Stony and KJK on market-driven, independent terms, these relationships were neither independent nor arm's-length, because Francesca's received exceptionally favorable terms from each. Next, it alleges that Francesca's had a vendor relationship with KKGM – itself a related party – and that the failure to disclose this relationship constituted a material omission. Third, Plaintiffs assert that *all* of the Company's financial disclosures and statements as to its financial performance *in general* during the Class Period were materially misleading because they "failed to disclose that these results were artificially inflated by the Company's improper relationships with its related party vendors KJK, Stony and KKGM, which afforded the Company preferential treatment that was not available to other retailers dealing with independent third-party vendors." (CAC ¶¶ 137, 148, 155, 160, 163, 171, 181, 189, 196, 199, 202.) Finally, Plaintiffs assert that the Company's failure to disclose in the March 2013 Offering materials that its vendor relationships were

"deteriorating" constitutes a material omission. (*Id*. ¶ 317.) The Court addresses each of these allegations in turn.

i. Relationship with KJK and Stony

The CAC first alleges that the Company's disclosures indicating that it dealt with KJK and Stony on "market terms" and in "arm's-length" transactions conducted "in the most upright fashion" constituted material misrepresentations, because these vendors were actually "captive" to Francesca's and gave the Company unusually favorable terms. However, missing from the sprawling, 345-paragraph CAC is anything supporting the fundamental and basic requirement under Section 10(b) and Rule 10b–5 that these statements *actually be false*. Specifically, not only does the CAC fail to allege that Francesca's received sweetheart deals from KJK and Stony while publicly stating otherwise, in fact, it fails to allege that *even if this were so*, the statements would have been misrepresentative in the first place.

Indeed, a fundamental problem with the CAC is that it misinterprets the purpose and meaning of the Company's assurances to the public regarding the arm's-length nature of its vendor relationships. The statements at issue did not mean that Francesca's was not aggressively negotiating with its vendors to obtain the best prices possible. Rather, they were clearly designed to inform the market that the Company negotiated terms no *less* favorable than it could receive from other, unrelated vendors, in order to alleviate concerns that Francesca's would give out preferential deals to related parties. That is, referring to a negotiation as arm's-length in this context obviously reflects the *Company's* perspective, and evinces the Company's cognizance of its obligation to negotiate for the best possible prices and terms for its shareholders; this is exactly

how an investor would have interpreted the disclosures. Clearly, the promise that a negotiation be "arm's-length" from one party's perspective does not paradoxically require that party to ensure that the *other* party to the negotiation *also* receives the best possible terms.

The CAC contains no allegations, of course, that Francesca's failed to live up to its promise to negotiate for the best terms it could receive from the Related Vendors; Plaintiffs' theory is just the opposite. Instead, Plaintiffs attempt to spin the fact that Francesca's negotiated "in the most upright fashion" – designed to assure investors that it would not settle for *suboptimal* terms in order to benefit the owners of its Related Vendors – into a promise that Francesca's would not bargain for *optimal* terms with those same vendors. In essence, Plaintiffs would have the Court believe that the statements at issue informed the market that Francesca's would not negotiate for the best possible terms in the face of its obligation to shareholders *to do just that*, effectively putting the Company in a "damned if you do, damned if you don't" position. Indeed, no reasonable investor would have taken the statements at issue to reflect a commitment by Francesca's to maintain an awareness of KJK's and Stony's bottom lines, carefully ensuring that Francesca's did not receive any preferential treatment in negotiations; such an interpretation would strain the clear import of the statements beyond any reason. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 614 (S.D.N.Y. 2008) ("The 'material misrepresentation or omission' element is analyzed objectively from the perspective of the reasonable investor.").

Although Plaintiffs purport to find support for such a proposition in the Related Party Transaction Policy, that Policy instead reflects the assurance that Francesca's would not *give out* preferential terms to its related vendors – *not* that it would decline to seek to *receive* the best possible terms from the Company's perspective. Specifically, as noted above, the Policy obligated Francesca's to conduct transactions "through a competitive bidding process or . . . on terms *no less favorable* than those generally available to unaffiliated third-parties." (CAC ¶ 143 (emphasis added).) In a "competitive bidding process," the vendor offering the terms most favorable to Francesca's would presumably be chosen, and it would defy logic to argue that seeking out the best possible terms from a related vendor would instead lead to "less favorable" terms. Thus, even if it received "below-market rates" – whatever that term might imply – from KJK and Stony, Francesca's would have been in full compliance with the Policy.

Likewise, while the CAC and Plaintiffs' opposition brief make much of De Meritt's "incredul[ity]" when asked whether investors should be concerned about the Company's relationships with its Related Vendors, he was clearly referring to the fact that Francesca's did not *give* preferential treatment to KJK and Stony in order to benefit their owners at the Company's expense. Additionally, given that the Company repeatedly warned investors that one of the most serious risks it faced was a potential "deterioration or change in . . . vendor relationships," (IPO Prospectus at 21; Jan. 2012 Offering Prospectus at 21–22; April 2012 Offering Prospectus at 20–21), investors certainly would not have been misled into believing that the terms between Francesca's and the Related Vendors would continue indefinitely.

Accordingly, even if Francesca's received better terms from KJK and Stony than it might have received if those vendors

were not related, its disclosures were not false, and are thus not actionable. Simply put, it is not securities fraud to negotiate for the best possible terms from a related vendor, notwithstanding the CAC's repeated and wholly unsupported references to the Related Vendor relationships as "improper."

Moreover, even if the allegedly false statements – indicating that negotiations took place at "arm's-length" and "in the most upright fashion" – could be construed as an assurance that Francesca's would negotiate with its related vendors for terms no less favorable, *and no more* favorable, than those available to unaffiliated third parties, the CAC does not come close to pleading that such statements were false. Specifically, the CAC sets forth no facts from which one could reasonably infer that Francesca's ever received sweetheart terms from KJK or Stony. Lacking *any* facts as to the actual contractual terms on which Francesca's dealt with the Related Vendors at any point during the Class Period, Plaintiffs instead attempt to support an inference that Francesca's received improper preferences based on (i) the fact that KJK subleased space from Francesca's, and that Francesca's received inventory from Stony and KJK on consignment and without supply contracts, and (ii) testimony from confidential witnesses attesting to the closeness of the relationships in question.

However, these allegations fall short of raising a plausible inference that the Company's disclosures allegedly indicating that it did not accept favorable terms from KJK and Stony were false. First, although Plaintiffs make much of the fact that Stony and KJK provided inventory on consignment and operated without supply contracts, and that KJK subleased space from Francesca's, *each* of these facts was disclosed by Francesca's on numerous occasions in its SEC filings. (*See, e.g.*, IPO Prospectus at 131–32.) It is difficult to imagine, without more, that the very facts Francesca's disclosed to the market regarding its dealings with KJK and Stony could themselves support an inference of falsity. Indeed, there is no inherent problem with subletting space to a vendor – in exchange for rent – or with purchasing merchandise on consignment. Moreover, to the extent Plaintiffs' allegations are based on the fact that Francesca's purchased from the Related Vendors without supply contracts, this circumstance carried risk for Francesca's too, as the vendors could cut off the relationships at any point. It certainly does not support an inference that Francesca's received unusually or improperly favorable terms from the vendors. Thus, Plaintiffs simply have not alleged any facts that would support an inference of impropriety or preferential treatment based on these select contractual terms. Nor have they put forth any facts supporting their assertion that the terms got any worse after Stony and KJK ceased to be related vendors in July 2012.

The confidential witness testimony in the CAC similarly fails to support an inference that the Company's representations as to its relationships with Stony and KJK were false. Statements indicating that the prices Francesca's received were "incredibly cheap," with margins that "are not possible in retail," that the Company's business practices were "shady" and "dishonest[]" (CAC ¶ 98-99), and that Francesca's "was not driven by the normal supply and demand process" (*id.* ¶ 95), are vague and conclusory, and are certainly not enough to allege that the Company's statements were false when made. Similarly, the fact that KJK "bent over backwards" for Francesca's, working "really closely" with the Company and doing it "a lot of favors" (*id.* ¶ 101), is clearly not improper, nor is the fact that

Stony serviced its Francesca's account with a team of employees, which was at the Company's nearly immediate disposal (*id.* ¶¶ 102, 105).[6]  Plaintiffs do not endeavor to explain why a supplier "bending over backwards" for its customers should be considered problematic.  Indeed, nothing is wrong or unusual about the fact that the Company's vendors treated it well, and Plaintiffs fail to allege in a non-conclusory manner that the terms Francesca's received from these vendors were better than those it could receive on an open market.  All told, these generic allegations do little to support any inference that Francesca's received better terms from the Related Vendors than it disclosed, or that its relationships were in some way improper.

Additionally, CW-1, the witness on whom the CAC most significantly relies, left Francesca's in early 2011 – near the very beginning of the Class Period – and cannot speak to whether the Company's terms with its Related Vendors changed in any material way in 2013, as the CAC alleges they did.  Furthermore, none of the other confidential witnesses offer any facts suggestive of artificially long or short lead times.

CW-1's post-Francesca's experience at Charming Charlie likewise fails to support an inference of falsity.  As noted above, CW-1 asserted that after leaving Francesca's and beginning to work at Charming Charlie, CW-1 noticed the prices Charming Charlie received from Stony were "definitely not as good as the prices they gave Francesca's." (CAC ¶ 97.)  Specifically, CW-1 stated that Stony sold products to Francesca's that allowed the Company to post a 70–80%

margin, while Charming Charlie could post only a 60% margin at the prices Stony charged it.  (*Id.*)  However, without more, this fact does not demonstrate that Stony gave preferential, below-market prices to Francesca's.  Obviously, a multitude of factors influence the prices a supplier can charge a retailer and the margins a retailer can maintain on a product.  To name just a very few, Charming Charlie may have bought and sold less merchandise from Stony; may have operated with higher costs, driving down its margins; may not have been able to sell its merchandise to consumers at as high a price; or simply may not have been as adept at negotiating as Francesca's.  The mere fact that the Company realized higher margins on Stony products than Charming Charlie did does not support an inference that Francesca's had a closer relationship with Stony than it disclosed.  In sum, Plaintiffs fail to plead that Francesca's received more favorable terms from KJK and Stony than its disclosures indicated.

Moreover, although dismissal on grounds of materiality is disfavored, *see Caiola*, 295 F.3d at 329, in light of the complete lack of any indication as to *what terms* the Company received from its vendors or *how*, if at all, those terms changed, let alone that a reasonable investor would have considered the change as significantly altering the "total mix of information made available," Dalberth, 766 F.3d at 183 (internal quotation marks omitted), Plaintiffs' speculation is insufficient to allow an inference of materiality here either.  *See Medina v. Tremor Video, Inc.*, No. 13-cv-8364 (PAC), 2015 WL 1000011, at *2 (S.D.N.Y. Mar. 5, 2015).

Accordingly, even drawing all reasonable inferences in Plaintiffs' favor, there are simply no facts in the CAC

---

[6] Furthermore, the fact that CW-1 called it "almost insulting" that Francesca's "tried to pass [KJK and Stony] off often as[] unrelated company[ies]" (CAC ¶ 98) is of no moment, because, of course, Francesca's did *not* try to pass them off as unrelated.

indicating that Francesca's actually received better terms from Stony or KJK than it could absent an "improper," or closer than disclosed, relationship. Nor have Plaintiffs offered evidence that the terms changed after the relationships supposedly soured. Thus, the Court finds that Plaintiffs have failed to plead any material misrepresentation with respect to the Company's relationships with KJK and Stony.[7]

ii. Relationship with KKGM

Plaintiffs next allege that Francesca's violated Section 10(b) and Rule 10b–5 by failing to disclose its relationship with KKGM. Because the CAC fails to plead either a duty to disclose or an actionable omission, this claim must also fail.

As an initial matter, Plaintiffs have not alleged facts sufficient to support a reasonable inference that Defendants had any duty to disclose a vendor relationship with KKGM during the Class Period – a prerequisite to establishing that an omission was actionable. *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ("An omission is actionable under federal securities laws only when the defendant is subject to a duty to

disclose the omitted facts." (alteration and internal quotation marks omitted)). Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information." *Dalberth*, 766 F.3d at 183. Rather, the duty necessary for an omission to be actionable may arise in two ways. First, it "may arise expressly pursuant to an independent statute or regulation – *i.e.* an affirmative legal disclosure obligation. [Second], a duty may arise as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). Plaintiffs allege that a duty existed for both reasons.

As to the allegation of a duty pursuant to an independent regulation, Plaintiffs contend that disclosure was required by Item 404 of Regulation S-K, which mandates the disclosure of all transactions (defined to include an "arrangement or relationship," or a "series" of transactions) with a related party in an amount exceeding $120,000. *See* 17 C.F.R. § 229.404(a). However, the CAC fails to plead that the Company's relationship with KKGM triggered a disclosure obligation under Item 404. The assertion that KKGM was one of the Company's vendors *at all* during the Class Period is based solely on the testimony of CW-1. (*See* CAC ¶ 40.) However, KKGM was incorporated only two months before CW-1 left Francesca's. (*See* Declaration of Jonathan D. Polkes, dated May 13, 2014, Doc. No. 38, Ex. 3 (KKGM certificate of incorporation).) Thus, with only two months of overlap between KKGM's existence and CW-1's tenure with Francesca's, and no indication that Francesca's remained KKGM's sole buyer for the balance of the 25-month Class Period, the fact that KKGM imported $500,000 worth of merchandise into the

---

[7] In so concluding, the Court does not consider a report by Ernst & Young indicating that "the margins at KJK and Stony are no better and no worse than the average vendor." (*See* Def. Mem. at 10; Def. Rep. at 3 n.2.) Contrary to Defendants' assertion, the CAC's single reference to this report (*see* CAC ¶ 198) does not amount to an "incorporation by reference" such that the Court may consider it at this stage. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) ("The amended complaint merely discussed these documents and presented short quotations from them. Limited quotation does not constitute incorporation by reference." (alteration and internal quotation marks omitted)).

United States during the Class Period alone does support a reasonable inference that KKGM supplied Francesca's specifically with $120,000 worth of inventory before Gill left the Company on July 10, 2012. (CAC ¶ 92.)[8]

Moreover, absent any facts suggesting *how much* inventory Francesca's received from KKGM, the CAC does not allow for a reasonable inference that Defendants had a duty to disclose the Company's relationship with KKGM "to avoid rendering existing statements misleading." *See Sanofi-Aventis*, 774 F. Supp. 2d at 561. There is no support for the proposition that, because Francesca's disclosed the relatedness of large-scale vendors Stony and KJK, it had a *duty*, in order to avoid rendering these other statements false, to disclose its relationship with KKGM *regardless of how small* a relationship it was. Such an assertion is simply not supported by the law. No

investor could conclude that disclosures as to KJK and Stony were effectively false simply because a relationship with KKGM was not disclosed here. Accordingly, Plaintiffs have not adequately alleged that Defendants were under any duty to disclose their relationship with KKGM.

Additionally, any claims regarding the Company's failure to disclose a relationship with KKGM must *also* fail on grounds of materiality. Even assuming that all $500,000 worth of merchandise that KKGM imported into the United States during the Class Period was sold exclusively to Francesca's at a consistent pace, the CAC does not plausibly allege that KKGM sold any more than $250,000 worth of inventory to Francesca's during the period in which it was a related party. In the face of $79 million in reported revenue during the first quarter of 2013 (*see* CAC ¶ 232), the mere relatedness of a party supplying $250,000 worth of inventory could hardly be considered a material fact significant in relation to investment decisions. *See, e.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 654 (S.D.N.Y. 2012) ("Although there is no bright-line numerical test for the materiality of an alleged misstatement, a five percent numerical threshold may provide an appropriate starting point." (citations omitted)); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160–61 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004) ("The undisputed portions of the Company's financial statements referenced in the Complaint establish that an inflation of $217 million in the Company's revenues for the relevant period amounts to about 0.3% of Duke Energy's total revenues for that period – an immaterial percentage as a matter of law.").

Accordingly, the Court finds that the CAC has failed to allege either that Defendants had a duty to disclose the

---

[8] While the CAC purports to plead that KKGM sold Francesca's $5–$7 million worth of inventory during the Class Period, Plaintiffs acknowledge that this is an estimate. (CAC ¶ 92.) It is derived from the fact that, because Francesca's sourced most of its products domestically and KKGM and KJK had the same overseas vendor, KKGM's ratio of imported-to-domestic merchandise must be similar to that of KJK – specifically, 9–10%. (*See id.*) Based on this assumption, Plaintiffs attempt to parlay the sole fact alleged – that KKGM imported $500,000 worth of merchandise during the Class Period – into an allegation that KKGM supplied Francesca's with at least $5 *million* worth of inventory. Such far-fetched assumptions are not sufficient to raise a plausible inference that KKGM was as significant a supplier as Plaintiffs assert. Moreover, the contention that KKGM exclusively supplied merchandise to Francesca's is based only on CW-1 "recall[ing]" this to be the case; given that CW-1 left the Company only two months after KKGM came into existence, while the Class Period lasted almost two more years, the Court finds that the CAC contains insufficient facts supporting the assertion that Francesca's remained KKGM's sole customer throughout the Class Period.

Company's relationship with KKGM or that its failure to do so was material, and thus fails to plausibly allege a material omission with respect to the Company's relationship with KKGM.

### iii. Financial Disclosures Generally

Plaintiffs also allege that *all* of the Company's disclosures of financial results during the Class Period – including its revenue, earnings per share, profit margins, etc. – were materially misleading as a general matter in light of their failure to inform the market that such results were "artificially inflated by the Company's improper relationships." (*See* CAC ¶¶ 137, 148, 155, 160, 163, 171, 181, 189, 196, 199, 202.)

However, as already noted, the CAC fails to allege that (i) Francesca's somehow obligated itself not to negotiate for the best possible terms from its vendors, (ii) Francesca's received below-market preferences in the first place, or (iii) Francesca's engaged in any "improper" conduct barred by law or regulation, including any antitrust or anti-bribery law. Accordingly, no disclosure was necessary to remove the taint of fraud from the Company's financial results, and Defendants did not violate Section 10(b) or Rule 10b–5 by failing to disclose that the Company's financials were premised, in part, on beneficial vendor terms. Simply put, Francesca's had no obligation to disclose the specific terms of its vendor relationships, much less to publicly assess those terms vis-à-vis their competitors and their vendors' competitors. Repeatedly and conclusorily referring to the relationships as "improper" does not alter this conclusion.

### iv. Failure to Disclose Deterioration of Relationships

Finally, Plaintiffs allege that the Company's failure to disclose in the March 2013 Offering materials that its vendor relationships were "deteriorating" constituted a material omission. The CAC asserts that this failure violated Item 303(a) of Regulation S-K, and that, in light of the disclosure obligation under Item 303(a) and the duty to disclose information necessary so as to not render existing statements misleading, it constituted a material omission under Section 10(b) and Rule 10b–5. This allegation fails as well.

Item 303(a) requires the disclosure of any "*known* trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact" on financial results. 17 C.F.R. § 229.303(a)(3)(ii) (emphasis added); *see, e.g., Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07-cv-10528 (RWS), 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) ("Knowledge of the existence of [the trend] at the time of the [registration statement] is an essential allegation for purposes of a claim based on Item 303."); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("Item 303's affirmative duty to disclose in [an SEC filing] can serve as the basis for a securities fraud claim under Section 10(b)."). Here, the only facts supporting the allegation of "deteriorat[ion]" are that Stony dismantled its Francesca's-specific sales team around the time of the March 2013 Offering and that CW-3 stated that KJK's relationship with Francesca's "hit a brick wall." (*See supra* Section I.A.4.) Especially in light of the CAC's failure to allege that the Company's relationships with KJK and Stony were improper or that Francesca's received unusual preferences from either, these allegations alone are not sufficient to

raise an inference that Francesca's had a duty to disclose any worsening vendor relationships under Item 303(a). Both CW-3's testimony and CW-4's testimony came from the perspective of the supplier, and the CAC contains no facts to support an inference that Francesca's was actually aware of any languishing relationship – or that the relationships were getting any worse from its perspective. *See Blackmoss*, 2010 WL 148617, at *9 ("Here, the Complaint does not allege that Defendants were actually aware of any purported 'trend of delinquencies and foreclosures' at the time of the IPO."); *cf. id.* (recognizing, in Securities Act Section 11 context, that "Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend"). CW-3's characterization of the change in the Francesca's-KJK relationship as "hit[ting] a brick wall" with a "sudden halt" adds little to the equation; such assertions are exactly the type of conclusory allegation that the Court need not accept as true in deciding a motion to dismiss. *See Iqbal*, 556 U.S. at 664. In any event, even if the Court were to accept these statements as true, they do not necessarily support an inference that the Company also felt that its relationship "hit a brick wall."

Moreover, in order for even a known trend or uncertainty to create a disclosure obligation, the degradation must have been significant enough that the Company should "reasonably expect[]" it to have a material unfavorable impact on its financials. 17 C.F.R. § 229.303(a)(3)(ii). Here, the CAC fails to plead in a non-conclusory manner that the prices or terms it received from KJK or Stony *even changed* during the Class Period. Lacking any facts as to *how* the relationships were getting worse – aside from the mere fact that Stony ceased to devote a team of salespeople exclusively to

Francesca's, not itself problematic – the CAC therefore fails to plausibly allege a change of circumstance that the Company should have reasonably expected would have a material impact on its financials. *See In re Authentidate Holding Corp. Sec. Litig.*, No. 05-cv-5323 (LTS), 2009 WL 755360, at *2 (S.D.N.Y. Mar. 23, 2009) (finding no Item 303(a) duty alleged where complaint was devoid of facts suggesting defendants should have known of substantial impending impact), *aff'd in part, vacated in part on other grounds sub nom. Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260 (2d Cir. 2010). In addition, any allegation that Francesca's should have known that its vendor relationships were falling apart is further undercut by the fact that Gill left the Company almost a year before the alleged deterioration. This fact – which *was* publicly disclosed in the 2012 10-K, along with the disclosure that Stony and KJK ceased to be related vendors as a result – further undermines Plaintiffs' assertion that Francesca's had a duty to disclose more concerning its vendor relationships.

Accordingly, the CAC fails to plead any material misrepresentation or omission, and the Section 10(b) and Rule 10b–5 claims must be dismissed.

### b.  Loss Causation

Even if the Court were to find that Defendants had made material misrepresentations or omissions as to the nature of the relationships between Francesca's and its vendors, the CAC does not properly plead loss causation, which is "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and internal quotation marks omitted); *see also Suez*

*Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (complaint must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered").

To plead loss causation, a plaintiff must do more than simply plead that the price of a security was artificially inflated by a misrepresentation or omission, *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), because an inflated price alone "at most 'touches upon' a later economic loss, and does not *cause* a loss," *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 752 (S.D.N.Y. 2011) (quoting *Dura*, 544 U.S. at 343) (emphasis in original). Rather, loss causation, as codified in the PSLRA, imposes on a plaintiff the "burden of proving that the act or omission of the defendant alleged to violate this chapter *caused the loss* for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (emphasis added); *see also ATSI Commc'ns*, 493 F.3d at 106 ("Loss causation . . . is the proximate causal link between the alleged misconduct and the plaintiff's economic harm."). To plead loss causation, a plaintiff may allege either that (i) a corrective disclosure informed the market of the fraud, and the market reacted negatively; or (ii) the risk concealed from investors materialized and caused a foreseeable loss. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014).[9]

Though the allegations of loss causation in the CAC are vague and ambiguous, Plaintiffs apparently attempt to plead loss causation based on both the corrective disclosure theory and the materialization of the risk theory. (*See* Opp. at 34.) Specifically, Plaintiffs assert that the September 4 Announcement and September 4 Call – in which Francesca's disclosed disappointing financials and attributed them in part to the Company's failure to "fully captur[e]" a trend – "fully revealed" the "truth" and constituted a corrective disclosure of the Company's previously improper and now deteriorating vendor relationships; Plaintiffs also allege that the Company's lead times and weakening financial results constituted a materialization of the undisclosed risk – namely, the improper and supposedly unsustainable relationships between Francesca's and the Related Vendors. As discussed more fully below, Plaintiffs fail to plead loss causation under either method.

### i. Corrective Disclosure

"In order to plead [loss causation based on a] corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected." *Carpenters Pension Trust*, 750 F.3d at 233 (alteration and internal quotation marks omitted)). While there is no requirement that the corrective disclosure spell out the specific fraudulent conduct or facially admit that a fraud was committed, pleading loss causation through the corrective disclosure theory nonetheless requires an *exposure* of some previous misrepresentation or omission. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) ("[There is no

---

[9] It is an open question in this Circuit whether the heightened pleading standard of Rule 9(b) applies to loss causation. *See Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 n.2 (2d Cir. 2013) ("[W]e do not conclusively decide whether the applicable pleading standard for loss causation is that of Fed. R. Civ. P. 8 or the heightened standard of Rule 9(b)."). Accordingly, because the CAC fails to adequately plead loss causation under either standard, the Court applies the more lenient standard of Rule 8 in

analyzing Plaintiffs' allegations of loss causation.

requirement] that a corrective disclosure take a particular form or be of a particular quality. It is the *exposure* of the falsity of the fraudulent representation that is the critical component of loss causation." (emphasis added) (alteration and internal quotation marks omitted)), *aff'd*, 597 F.3d 501 (2d Cir. 2010).

Here, nothing in the September 4 Announcement or Defendants' contemporaneous statements corrected any of the allegedly false statements from the past. To the contrary, during the September 4 Call that Plaintiffs allege contained a corrective disclosure, the Company's CFO, Mark Vendetti, *reaffirmed* that lead times were approximately 4–12 weeks – the same lead times disclosed during the time frame in which Francesca's allegedly misrepresented its vendor relationships. Significantly, the call did not touch on any other vendor terms.

Faced with this reality, Plaintiffs appear to rest their entire corrective disclosure-based loss causation argument on one of the reasons provided by Francesca's for its relatively poor performance for the second quarter of 2013. Specifically, during the September 4 Call, Davis identified a single specific trend – "During the quarter, we had identified that our Tops business needed to be more wear-now and summery" – and then acknowledged that "the lead times to reorder prevented us from fully capturing [that] trend." (September 4 Call Tr. at 3.) However, this acknowledgment alone does not suggest that the September 4 Call was in any way corrective. Indeed, at no point during the September 4 Call did any representative of Francesca's indicate that the lead times associated with the Company's failure to chase the particular trend were "unusual" or any longer than normal. Obviously, even with short lead times and a successful merchandising

strategy, a company may still not be able to order and stock inventory quickly enough to "fully captur[e]" a specific trend. Consequently, the lack of any comparison to previous lead times or factual support for the proposition that the Company's deteriorating vendor relationships *lengthened* its lead times is fatal to the CAC's attempts to plead loss causation by corrective disclosure. Investors simply could not have inferred the falsity of the prior statements regarding the Company's vendors from the September 4 Call. Thus, because nothing in the September 2013 disclosures "revealed[ed] to the market the falsity of the prior" statements, it is clear that no corrective disclosure was made. *Lentell*, 396 F.3d at 175 n.4.

### ii. Materialization of the Risk

Nor does the CAC plausibly allege that any loss to investors was "caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Trust Fund*, 750 F.3d at 233. To plead loss causation under the materialization of the risk method, a plaintiff must allege that new information has "come[] to light in a series of revealing events that negatively affect stock price over time," even though the new information does not specifically "identify prior information as misleading," as under the corrective disclosure method. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011). The new information revealed must also "fall within the 'zone of risk' concealed so that the events were foreseeable consequences of the fraud." *Id.*; *see also Salvani v. ADVFN PLC*, No. 13-cv-7082 (ER), 2014 WL 4828101, at *12 (S.D.N.Y. Sept. 23, 2014) (same); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a

plaintiff may plead that it is the materialization of the undisclosed condition or event that causes the loss." (internal quotation marks omitted)).

For example, in *Heller v. Goldin Restructuring Fund, L.P.*, the court determined that the plaintiff adequately pleaded loss causation under the materialization of the risk theory where the defendant had failed to disclose, and actively concealed, the fact that the investment fund into which the plaintiff was asked to invest was "so severely under-capitalized that it could not possibly meet its stated investment objective and prudently diversify its portfolio." 590 F. Supp. 2d at 624. The court found that the loss of plaintiff's investment was plausibly caused by a "foreseeable materialization of the concealed risk – namely, that the undercapitalization . . . and the [fund's] subsequent inability to follow through on its investment strategy of obtaining a diverse portfolio of eight to twelve . . . companies, led to a high-risk investment in only one company, which resulted in Plaintiff's monetary losses." *Id.*; *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (finding loss causation element satisfied where defendant concealed fact that company had "massive undisclosed debt" it was unable to service, where foreseeable consequence of such inability was liquidity crisis and resulting financial collapse).

In contrast, here, the CAC here fails to allege either that any risk was concealed or that a foreseeable materialization of that risk led to Plaintiffs' losses. As to the requirement that a risk was concealed, Francesca's repeatedly disclosed that KJK and Stony were related, and that the possibility of its vendor relationships getting worse was one of its primary risks. (*See* IPO Prospectus at 21; Jan. 2012 Offering

Prospectus at 21–22; April 2012 Offering Prospectus at 20–21). Surely no reasonable investor would have been misled into believing that the Company's relationships with each of its vendors would remain unchanged forever in light of this clear warning. Nor would assurances that Francesca's negotiated with KJK and Stony at "arm's-length" have confused investors into believing that the Company's officers and directors were not seeking out the best terms possible from its vendors, as noted above. Moreover, Francesca's disclosed to the market nearly *one year* before the relationships allegedly went south that KJK and Stony were no longer "related" for purposes of SEC regulations. (*See* CAC ¶ 211; 2012 10-K.)

As to the requirement of a foreseeable materialization of whatever risk was concealed, Plaintiffs' allegations are also insufficient. The CAC fails to indicate what terms existed between Francesca's and its vendors at any point, much less how those terms *actually got worse* in a manner reflecting that a risk materialized. Absent any facts as to the nature of terms between Francesca's and its vendors before *or* after the relationships allegedly soured – aside from details suggesting that lead times did not actually change at all – the CAC fails to raise an inference that a materialization of the risk caused Plaintiffs' losses. *See Lentell*, 396 F.3d at 176–77 ("To plead successfully that [defendant's] fraud caused their losses, plaintiffs were required to allege facts to establish that [defendant's] misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value.").

To be sure, Plaintiffs point to the fact that Francesca's missed its earnings forecast in the second quarter of 2013, and that it generally had worse financial results than

expected in that quarter, as evidence that the concealed risk materialized. However, the law is clear that Plaintiffs must do more than simply point to missed earnings forecasts or other "bad news" to plead loss causation. *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678–79 (S.D.N.Y. 2007) ("[T]he mere failure to meet earnings forecasts is insufficient to establish loss causation."); *see also ATSI Commc'ns*, 493 F.3d at 107 ("[The complaint] fails . . . to establish any causal connection between those losses and the misrepresentation."). Conclusorily recharacterizing the September 4 Announcement and September 4 Call as reflecting that "the truth was finally revealed" and the "risk materialized" is simply not enough. *See Wilamowsky*, 818 F. Supp. 2d at 757 (noting the court's "obligation to analyze whether a pleading contains sufficient 'factual content . . . to draw the reasonable inference that the defendant is liable for the misconduct alleged'" (quoting *Iqbal*, 556 U.S. at 663)). Similarly, the conclusory allegations that KJK's relationship with Francesca's "hit a brick wall" and came to a "sudden halt" (CAC ¶¶ 113, 294) do not suggest *how*, if at all, the terms the Company received from KJK got worse.

Indeed, any allegation that the risk of the previously-closer-than-disclosed vendor relationships falling apart "materialized" is further undermined by the significant lag time between Gill leaving Francesca's in July 2012 and the relationships supposedly deteriorating in the spring of 2013. Although the CAC purports to identify De Meritt's exit as the defining date for the disintegration of vendor relationships, it does not plausibly allege that this later date – as contrasted with Gill's exit, at which time the Related Vendors ceased being related pursuant to Item 404 – had any impact on vendor relationships. Simply put, even to the extent that the CAC alleges that

Francesca's received preferential terms from the Related Vendors at any point in time – which it does not – it certainly does not plead facts supporting a plausible inference that such preferential terms continued beyond Gill's retirement and until De Meritt retired merely because De Meritt, as one of the Founders, was close with the other Founders in control of KJK, Stony, and KKGM.

Thus, Plaintiffs' theory paints a picture whereby preferential terms continued for nearly a full year after the Related Vendors ceased being related, only to abruptly fall apart in the spring of 2013. "The number of dots the Court must connect to produce an adequate theory of loss causation are too numerous and attenuated to succeed." *Lululemon*, 2014 WL 1569500, at *7; *see also Wilamowsky*, 818 F. Supp. 2d at 756 ("Because under these circumstances, the 'relationship between the plaintiff's investment loss and the information misstated' is highly 'attenuated,' the fraud claim may not lie." (quoting *Lentell*, 396 F.3d at 174)); *see also Salvani*, 2014 WL 4828101, at *12 ("The materialization of risk theory thus requires a *direct connection* between the *risk that is hidden* from investors and the subsequent loss suffered by those investors." (emphasis added)); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Certainly [the company's] stock price declined following the . . . press releases, but Plaintiffs have failed to show how the . . . disclosure is related to the fraud claims and why the . . . disclosure they focus on caused the decline, as opposed to the simultaneous disclosure of [other conditions].").

Additionally, the fact that the Company's unsold inventory increased during the second quarter of 2013 is not itself evidence that deterioration of vendor

relationships caused the Company's worsened financial performance; indeed, it is entirely consistent with difficult retail conditions in which fewer consumers make purchases.[10]

Accordingly, with no facts suggesting that the terms of the Company's purchases from the Related Vendors got any worse between the time period covered by the alleged misrepresentations and September 2013, and no facts supporting an inference that the risk Francesca's concealed materialized and caused the drop in the Company's share price, the CAC does not raise a plausible inference of loss causation.

\*       \*       \*

In sum, Plaintiffs' allegations are long on innuendo but extremely short on facts. As a result, Plaintiffs have failed to allege any misrepresentation or omission of a material fact, or that any alleged misrepresentation or omission caused their losses. Either deficiency alone would be fatal to Plaintiffs' claims under Section 10(b) of the Exchange Act and Rule 10b–5 claims. Accordingly, these claims are dismissed.

---

[10] The Court is unsure what to make of the fact that, according to CW-5, Francesca's "suddenly started issuing dramatically higher sales goals" to CW-5's store beginning in the spring of 2013 (*see* CAC ¶ 117); in fact, such an allegation seems to undercut Plaintiffs' argument that Francesca's was deteriorating. Moreover, the fact that CW-5's store also began *missing* its sales goals around this time is likewise insufficient to raise an inference that deteriorating vendor relationships caused any diminished performance; instead, missed sales goals merely *reflect* diminished performance, whatever its cause. Indeed, perhaps the missed sales goals were directly related to the "dramatically higher sales goals" issued by Francesca's. Of course, the Court need not engage in this type of speculation as Plaintiffs do.

### 2. Section 20(a)

The CAC also asserts claims under Section 20(a) of the Exchange Act. Section 20(a) imposes "control person" liability on defendants in control of an entity that has violated Section 10(b) and Rule 10b–5. *See* 15 U.S.C. § 78t(a). "In order to establish a *prima facie* case of liability under Section 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted). Thus, "[i]t is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, No. 13-cv-1094 (ER), 2014 WL 3605540, at \*1 (S.D.N.Y. July 21, 2014).

Here, because the CAC does not adequately plead a Section 10(b) or Rule 10b–5 claim, the Section 20(a) claim must fail as well. Accordingly, Plaintiffs' Section 20(a) claim is dismissed.

### B. Securities Act Claims

#### 1. Sections 11 and 12(a)(2)

Plaintiffs also bring strict liability and negligence claims under Sections 11 and 12(a)(2) of the Securities Act for allegedly untrue statements and material omissions made in the offering materials for the three Secondary Offerings conducted by Francesca's during the Class Period. "Section 11 deals with [misrepresentations or omissions in] registration statements, while Section 12 covers [misrepresentations or omissions in] prospectuses." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 433

(S.D.N.Y. 2009). That is, Section 11 imposes liability on "every person who signed the registration statement, the directors of the issuer, and the underwriters of the security," while Section 12(a)(2) "creates liability for any person who offers or sells a security by means of a prospectus or oral communication that includes a material misrepresentation or omission." *Id.* at 434 (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)). Unlike under Section 10(b) of the Exchange Act or Rule 10b–5, a plaintiff bringing a claim pursuant to Section 11 or Section 12(a)(2) of the Securities Act need not allege scienter, reliance, or loss causation. *See Rombach*, 355 F.3d at 169 n.4 ("Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action."); *Briarwood Invs. Inc. v. Care Inv. Trust Inc.*, No. 07-cv-8159 (LLS), 2009 WL 536517, at *3 (S.D.N.Y. Mar. 4, 2009) ("A plaintiff is not required to plead 'loss causation' . . . to establish a prima facie claim under [Sections] 11 or 12(a)(2) of the Securities Act."); *Degulis v. LXR Biotech.*, No. 95-cv-4204 (RWS), 1997 WL 20832, at *3 (S.D.N.Y. Jan. 21, 1997) ("Neither knowledge nor reason to know is an element in a plaintiff's prima facie case."). Rather, "to make out a prima facie case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission." *Degulis*, 1997 WL 20832, at *3.

Here, because the Court has concluded that the CAC fails to allege that any of the Company's disclosures – including the offering materials for the Secondary Offerings – contained any material misrepresentation or omission (*see supra* Section III.A.1.a), Plaintiffs' claims pursuant to Section 11 or Section 12(a)(2) of the Securities Act are also dismissed.

### 2. Securities Act Section 15

Finally, Plaintiffs allege violations of Securities Act Section 15 against Defendants CCMP, De Meritt, Davis, Vendetti, and the Director Defendants. Section 15 imposes "control person" liability on parties in control of an entity that violates Section 11 or Section 12(a)(2). *See* 15 U.S.C. § 77o. "In order to establish a prima facie Section 15 claim, a plaintiff need only establish (1) control, and (2) an underlying violation of Section 11 (or Section 12(a)(2))." *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (internal quotation marks omitted). As the Court has concluded that the CAC fails to allege any underlying violation of Sections 11 and 12(a)(2), the CAC also fails to state a Section 15 claim. Accordingly, this claim is dismissed as well.

### C. Leave to Amend

At the end of their brief in opposition to Defendants' motions to dismiss, Plaintiffs make a perfunctory request for leave to amend the CAC in the event that the Court grants the motions. The Court treats the request as a motion to amend the CAC, and denies it.

Although Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that courts "should freely give leave [to file an amended complaint] when justice so requires," Fed. R. Civ. P. 15(a)(2), district courts have "broad discretion" in deciding whether or not to grant such leave, *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07-cv-318 (RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009) (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, No. 06-cv-12967 (PAC), 2008 WL 2414047, at *2 (S.D.N.Y. June 12, 2008)); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Factors that

are relevant to the exercise of the Court's discretion include: (1) the presence of bad faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to an opposing party; and (3) whether the sought-after amendment would be futile.  *See, e.g.*, *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 523–24 (S.D.N.Y.2009).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Here, Plaintiffs have offered no indication as to what facts they would allege, given the opportunity, that could cure the deficiencies in the CAC identified above.  Indeed, if Plaintiffs knew what terms existed between Francesca's and the Related Vendors before and after the relationships allegedly deteriorated, or knew by how much, if at all, the terms got worse – or even had factual support for the proposition that the Company's disclosures meant what Plaintiffs allege they meant – Plaintiffs presumably would have included that information in the CAC.  They have not, and the Court finds no basis to believe they could cure that failure given an opportunity to amend.  Accordingly, Plaintiffs' motion to amend the CAC is denied as futile.  *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014).

### IV. CONCLUSION

Plaintiffs here have opportunistically sought to attribute a share price decline in the stock of Francesca's to allegedly "improper" relationships between the Company and three of its vendors, attempting to spin unremarkable, and largely disclosed, business practices into actionable securities fraud.  But their vague allegations offer no support for the proposition that the relationships in question were in any way improper, or that Francesca's negotiated with its vendors in anything but the most upright fashion.  Indeed, Plaintiffs' theory fails to support a plausible inference that Defendants made *any* false statements, or that the Company's disclosures caused any loss suffered by Plaintiffs.  At base, their claims amount to little more than an assumption-laden hunch, ascribing lukewarm financial results to a vague form of deceit in a theory that is itself full of gaps.  Needless to say, more is required to bring claims under the United States securities laws.

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motions to dismiss the CAC are GRANTED.  IT IS FURTHER ORDERED THAT Plaintiffs' motion to amend the CAC is DENIED.  The Clerk of the Court is respectfully directed to terminate the motions pending at docket entry numbers 33 and 36 in No. 13-cv-6882 (RJS) and at docket entry numbers 20 and 23 in No. 13-cv-7804 (RJS), and to close both cases.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 31, 2015
New York, New York

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-31-15

25

        \*     \*     \*

Plaintiffs are represented by John C. Browne and Katherine M. Sinderson of Bernstein Litowitz Berger & Grossmann, 1285 Avenue of the Americas, 38th Floor, New York, NY 10019, and Jonathan Gardner, Paul J. Scarlato, and Carol C. Villegas, of Labaton & Sucharow LLP, 140 Broadway, New York, NY 10005.

Defendants Francesca's Holdings Corporation, Greg Brenneman, Mark Vendetti, Kyong Gill, Neill P. Davis, Richard Zannino, Theresa R. Backes, Patricia Bender, Richard Emmett, Joseph Scharfenberger, Richard Kunes, Marie Toulantis, CCMP Capital LLC, CCMP Capital Investors II, LP, CCMP Capital Investors (Cayman) II, L.P., and CCMP Capital Advisors, LLC are represented by Jonathan D. Polkes, Stacy Nettleton, and Eric C. Hawkins of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153.

Defendants Goldman, Sachs & Co., J.P. Morgan Securities LLC, Jefferies & Company, Inc., Keybanc Capital Markets Inc., RBC Capital Markets L.L.C., and Stifel, Nicolaus & Company Incorporated are represented by Todd Cosenza of Wilkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, and Richard D. Bernstein of Wilkie Farr & Gallagher LLP, 1875 K Street, N.W., Washington, D.C. 20006.